## Case No. 6,412.

### HERN v. The ANTHRACITE.

[2 Leg. & Ins. Rep. (1860) 58.]

Circuit Court, E. D. Pennsylvania.

COLLISION—TUG WITH TOW—FREE STEAMER.

1. Although it may be true, as a general rule, that a free steamer, meeting a tug incumbered by tows, must keep out of the way, yet it does not follow that the tug with the tows can monopolize the channel, or disregard the rules of navigation, going where and how she pleases, without regard to the rights and conveniences of others.

2. The rule that all steamboats bound up or down the river, with vessels in tow, should keep as near the right-hand shore as their respective drafts of water will permit, is a just and proper one.

3. Though a tug may be unable to stop or back tows attached to her by a hawser, and that duty, therefore, be cast upon the unincumbered boat, yet this inability will not justify the tug in disregarding the rule of porting her helm, and keeping to the right or starboard side of the river or channel.

[Cited in The Alleghany, Case No. 204.]

4. If it be necessary that tows shall be taken from one slip to another, attached in this manner, those who manage them should be bound to use the utmost care and caution. A course should be taken least likely to interfere with others, or imperil the tow.

[Appeal from the district court of the United States for the Eastern district of Pennsylvania.

[In admiralty. Suit by Henry Hern against the steamer Anthracite.]

GRIER, Circuit Justice. I cannot bring my mind to the conclusion that the blame of this collision is to be attributed wholly to the Anthracite. Although it may be true, as a general rule, and under many circumstances, that a free steamer, meeting a tug incumbered by tows, must keep out of the way, yet it does not follow that the tug with its tow can monopolize the channel, or disregard the rules of navigation, and go where she pleases,—spread herself as wide, and make herself as long, as may suit her convenience, without regard to the convenience and rights of others. Indeed, the existence of such a rule is denied altogether in the case of New York St. Co v. Philadelphia St. Co., 22 How. [63 U. S.] 472. Nevertheless, there may be cases in which the parties should be held to its observance. A tug is unable to stop or back tows attached to her by a hawser, and therefore that duty may be fairly cast upon the unincumbered boat. But this inability will not justify her in disregarding the rule of porting her helm, and keeping to the right or starboard side of the river or channel. It is truly said, in the case just quoted, "that those in charge of such boats ought to augment their vigilance in proportion to the embarrassments they have to encounter."

The rule laid down by Judge Kane in Flannery v. The Ontario [Case No. 4,856], "that all steamboats bound up or down the river, with vessels in tow, should keep as near the right-hand shore as their respective drafts of water will permit," is a very just and proper one. Those who thus incumber themselves should not unnecessarily embarrass others, and call out to all persons, "Keep clear of us, at your peril!" It was well observed in the last-mentioned case, "That to exempt herself from liability, the tug or towing steamboat must be careful not to heighten the risk of herself and others by any want of prudence either in the disposition of the convoy or in the manner of navigating it; the number and size of the vessels which she takes in tow, (and I would add the mode of their attachments,) should have careful relation to her power of regulating their movements, to the nature of the voyage, the number of the vessels to be passed by the way, and the facilities of the particular navigation." It may well be doubted whether the master of a tug which is conveying boats from one slip or dock to another in the crowded harbor of Philadelphia, is acting with prudence or caution in attaching them to his boat by a long hawser. His course is necessarily circular, his tow not under his control. He sweeps the harbor like a net; he embarrasses all others coming out or going in the dock, or passing down the river within the points of his departure and destination. If it be necessary, which I doubt, to the navigation of

this port that tows shall be taken from one slip to another attached in this manner, those who manage them should be bound to use the utmose care and caution. The person at the helm of the tows should have experience and judgment. The tug should take a course least likely to interfere with others, or imperil his tows. His maxim should not be "Caveat ille, ego non cavebo!" If he chooses to incumber himself with a tow which he cannot control, he has no right to impose upon others the duty of avoiding its eccentricities of motion, and the blame for accidents consequent thereon.

With these remarks on the general principles which have been ventilated in the argument as applicable to this case, let us proceed to notice more particularly the peculiar circumstances attending this collision. The Anthracite is a propeller, which navigates the bays and the canal across New Jersey, about twenty-three feet wide, slow and sluggish in her motion. She was coming down along the eastern shore of the river, in the harbor of Philadelphia. She was in her proper place, about fifty yards from the wharf, intending to pass between the wharves and a sloop anchored at some distance from them; but, the master finding that a line had just been run from the sloop to the wharf, he was compelled to run on the outside of her, and alter his course for this purpose; he then discovered the tug about four hundred feet below the sloop; it passed about sixty feet wide of her. It afforded ample room for the Anthracite, accustomed to pass through much narrower places, and under no great headway, to pass without danger. I don't think any very satisfactory result, as to the distance between the tug and the sloop, can be effected by averaging the conjectures of the witnesses. The libel alleges sixty feet, and if it was less than forty, as estimated by the captain of the sloop, the master of the tug was guilty of the first act of imprudence and negligence, in dragging his tows so near to the sloop that any want of skill or care by the steersman of the tows might bring them into a collision with it. Less than the distance alleged in the libel would leave the master of the tug justly liable to blame for want of care and judgment in conducting his tows, and if he was aware beforehand of the impediment connecting the sloop with the wharf, and saw the approach of the Anthracite, it was his duty to have gone further out in the channel, by porting his helm. The pine wood on the deck of the sloop hindered the master of the Anthracite from immediately perceiving the tows. When he first observed the tows shearing in towards the sloop, he was about three hundred feet from them, and he slowed his boat, supposing he could pass. He might have stopped her altogether, and ought to have done so. But, though this mistake in judgment may have been one of the causes of his collision, I am far from being of the opinion that the whole blame rests on him. The witness Taylor, captain of the sloop, was in a situation to see distinctly, and judge correctly of the persons who brought about this collision, and is without bias from any connexion with either party. He says, "When the tug went off from Vine street, she did so quartering across the river; she passed from thirty to forty feet from me, probably more. There was plenty of room for the Anthracite to pass. Just before the tug got up to me I hallooed out to the fellow steering the canal boat to keep her off or he would be into me. He was coming so much towards me that a man on deck of the canal boat went forward and picked up a fender to keep off of me; she got another shear on her, and cleared me about eight feet. I don't think the man at the helm of the tow was minding his business, or he would not have been so close to me; he sheared out again when I hallooed. He was gawking,—looking at the town,—instead of following the tug. If the tow had been properly after the tug, there would have been no collision. The Anthracite was going a little ahead; at the time of the collision they had partly stopped her. The tug was going at the rate of six miles an hour; the tug had stopped, pretty much so, but the canal boat was going by at the rate of six miles an hour. In my opinion the fault of this accident was that of the man at the helm of the canal boat." Now, here we have not only the man at the helm either totally incompetent, or utterly inattentive to his duty. But the master of the tug, when he saw there might be danger of a collision, did the only thing which could render it certain, —he stopped the tug. He might as well have cut the hawser. He left the tows under a high momentum, without any power to correct their course. A grosser case of mismanagement can hardly be imagined. It would be very improper for the propeller to have attempted to cross the bows of the tug; but her master had time, after he saw the tow approaching in this irregular manner, to have entirely stopped and backed his boat. But I do not think that there is such an unavoidable tendency of tows to shear or pursue a zig-zag course, if properly managed, that the master of the propeller was bound to anticipate it, or to have regulated his motions on the presumption that the tow will not follow the line of direction given it by the tug, or that the steersman is incompetent, or gazing or "gawking" around, and paying no attention to his duty. We cannot proportion the damages; the collision cannot be classed with those that are inevitable, or without fault on either side. Nor can the damages be assessed according to any ratio of degrees of blame; but where both are in fault, the damages must be equally divided. The case is referred to the clerk, as commissioner, to report the amount of damage to the propeller, if any; that of the tow appears to have been ascertained by the commissioner

on the trial in the district court [case unreported], and no exception has been taken to his report.